UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AMY NEELY and DAVID NEELY
Individually and on Behalf of J.N., et al.                                          PLAINTIFFS

V.                                                          CIVIL ACTION NO. 3:21-CV-786-DPJ-ASH

GREAT ESCAPES PELAHATCHIE, LP,
d/b/a Jellystone Park Yogi on the Lake, et al.                                  DEFENDANTS

ORDER

After eleven children caught a dangerous strain of the *E. coli* bacterium, the Mississippi

State Department of Health investigated the outbreak.  It found the common factor among the

victims was "likely related to a contamination event in the recreational waters at" a water park in

Pelahatchie, Mississippi.  MSDH Rpt. [412-6] at 8–9.  Seven children and their families sued the

water park and others.  Defendants Great Escapes Pelahatchie, LP d/b/a Jellystone Park Yogi on

the Lake; Great Escapes Pelahatchie Management LLC; TJO 10x10 Management LP; The

Jenkins Organization, Inc.; and Ricky Jenkins (collectively "the Park") now seek to exclude

Plaintiffs' expert witnesses on liability as well as the MSDH report.  Mots. [412, 414, 416, 422].

Finding the report and experts' opinions are mostly admissible, the Court grants the motions in

part and denies them in part.[1]

I.      Background

The water park is part of a campground called Jellystone Park Yogi on the Lake.

Plaintiffs visited Jellystone at various times from Friday, July 30, to Sunday, August 1, 2021.  No

one disputes these visits or that the children used the Jellystone swimming pool and splashpad,

---

[1] Defendant Leisure Systems, Inc. did not join in these motions, and a separate order addresses
its own *Daubert* motion.  Note also that all exhibits are cited by ECF pagination except
deposition transcripts, which are cited by original transcript pagination.

which has been described as a "shallow pool" with play structures. Dec. of Joseph Baumer [416-4] ¶ 7.

Nor is there dispute that the children were diagnosed with the *E. coli* O157:H7 bacterium shortly after visiting Jellystone. "Unlike the harmless *E. coli* bacteria commonly found in human intestines, *E. coli* O157:H7 produces Shiga toxins, which cause inflammation of the colon and large intestine, resulting in stomach cramps and bloody diarrhea. Hemolytic uremic syndrome is a severe complication of *E. coli* O157:H7 infection that can cause anemia and kidney damage." *Am. Home Assur. Co. v. Greater Omaha Packing Co.*, 819 F.3d 417, 420 (8th Cir. 2016).

The parties do, however, disagree on two primary points. First, they dispute the severity and duration of the claimed injuries. Second, they disagree whether the children caught the bacterium from the Jellystone pools. As to that issue, the Park asks the Court to exclude four liability experts designated by Plaintiffs:

- Mississippi State Department of Health—specifically the MSDH report on the *E. coli* outbreak as well as any future testimony from MSDH employees who participated in investigating the outbreak.

- Kirk E. Smith—the Epidemiologist Program Manager at the Minnesota Department of Health, who offers opinions on the methods and conclusions of the MSDH report.

- Barbara Kloberdanz—an aquatics expert with opinions about the Park's policies and pool maintenance regarding its pools.

- Alison Osinski—another aquatics expert with opinions similar to Kloberdanz's.

II.    Standard

As recently amended, Federal Rule of Evidence 702 allows admission of expert testimony if its proponent shows four elements by a preponderance of the evidence:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held Rule 702 requires the district court to act as a gatekeeper to ensure "any and all scientific testimony or evidence admitted is not only relevant, but reliable." This gatekeeping function applies to all forms of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The party offering the testimony bears the burden of establishing admissibility by a preponderance of the evidence. *United States v. Kuhrt*, 788 F.3d 403, 420 (5th Cir. 2015).

As gatekeeper, the Court must examine reliability and relevance. The reliability inquiry assesses the validity of the expert's reasoning and methodology underlying the testimony. *See Daubert*, 509 U.S. at 593. The Court must exclude any opinions based merely on subjective belief or unsupported speculation. *See id.* at 590. "[F]undamentally unsupported" opinions "offer[ ] no expert assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

Factors pertaining to reliability may include (1) whether a technique has been tested, (2) whether it's been subjected to peer review and publication, (3) its potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson v. Tex. Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004). But the Supreme Court emphasizes these factors "do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). Rather, courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

"The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Eng'red Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). And "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

As for relevance, the Court asks whether the expert's reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02] (1988)).

The Court's gatekeeper function doesn't replace the traditional adversary system or the jury's role. *See id.* at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Thus, in determining the admissibility of expert testimony, the district court must accord the "proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). Whether the expert's opinions are correct is not for the Court to decide. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

III.    Discussion

A.    The MSDH Report

After learning about *E. coli* O157:H7 diagnoses related to Jellystone, MSDH investigated and later issued a report on its findings.  MSDH Report [461-1] at 1.  In that report, MSDH "recognized" an "association with the swimming pool and splashpad . . . as the common source exposure."  *Id.*  MSDH explained its investigation and ended with four conclusions:

> An outbreak of gastrointestinal illnesses occurred among individuals who were exposed to the swimming pool and splashpad at Jellystone Park Camp Resort-Yogi on the Lake in Pelahatchie, MS (Resort) from July 30, 2021, through August 1, 2021.  In total 11 cases of *E. coli* O157:H7/STEC and Hemolytic Uremic Syndrome (HUS) in children ranging from less than one year to 9 years of age were identified.  Six of the cases were hospitalized; no deaths were reported.  All cases associated with this outbreak had direct exposure to the swimming pool and splashpad at the Resort between July 30, 2021, and August 1, 2021.  No cases were identified among individuals who did not report direct exposure to the swimming pool or splashpad at Yogi on the Lake, and no other common source exposures between the cases were identified.
>
> Whole genome sequencing of six isolates conducted at the MPHL demonstrated all the isolates were identical, indicating a common source exposure.
>
> The pool and splashpad were closed to the public on August 9, 2021.  An environmental observation on August 10, 2021, confirmed remediation measures in progress and completed.  On August 12, 2021, the pool and splashpad were allowed to reopen.  No cases of *E. coli* O157:H7 associated with this outbreak were identified outside of the July 30-August 1 timeframe.
>
> No further cases of *E. coli* O157:H7 have been identified since with exposure to the swimming pool or splashpad at the Resort, indicating that this was likely a onetime exposure event occurring over this several day period, likely related to a contamination event in the recreational waters at this facility, possibly from an infected swimmer who was shedding bacteria, though the actual source of contamination remains unknown.

*Id.* at 5–6.

The Park seeks to exclude expert opinions from MSDH but primarily focuses on the conclusion that an "association" existed between the outbreak and the Park's pools.  As Plaintiffs

note, not everything in the report would be considered expert opinion, Pls.' Mem. [461] at 6, but the parties focus on the Rule 702 issues.

       1.     "MSDH is not qualified to offer opinions on aquatics."

To begin, the Park says MSDH offers unqualified opinions on aquatics, which the Park appears to define as "expertise in recreational pool water." Park Mem. [413] at 6. But Plaintiffs proffer the MSDH employees as experts in epidemiology, not recreational pool water. Pls.' Mem. [461] at 1. Indeed, the opinions found in the report relate to MSDH's epidemiological study.

As to epidemiology, MSDH is the state agency tasked with conducting epidemiological investigations, including those related to waterborne outbreaks. And nothing suggests that its employees—including the doctors who oversaw the investigation—lack the "scientific, technical, or other specialized knowledge" to testify regarding the epidemiological investigation they performed. Fed. R. Evid. 702. The MSDH witnesses possess adequate qualifications to testify regarding expert opinions found in the report.

       2.     "MSDH's 'association' was not based on sufficient facts and data."

The Park contends that MSDH should have visited Jellystone, tested the water, tested goose feces (which were prevalent on the grounds, though perhaps not around the pools), and done other things it did not do. According to the Park, these omissions leave the report with a "complete lack of data." Park Mem. [413] at 10 (citation omitted).

That's an overstatement. As MSDH explains, it first learned on August 6, 2021, that a patient tested positive for *E. coli* O157:H7 at a Jackson hospital. MSDH Rpt. [412-6] at 2. By Monday, August 9, MSDH found "five cases among unrelated groups" who visited Jellystone, and it sent a statewide alert to health providers to test stool samples of patients with

6

gastrointestinal illness and to report all cases of O157 infection—not just those associated with Jellystone.  MSDH Alert [412-4].

More cases then surfaced, all from people who had visited Jellystone between July 30 and August 1.  MSDH Rpt. [412-6] at 2.  MSDH then investigated the outbreak by using "a standard *E. coli* Hypothesis Generating questionnaire" to interview the eleven cases about their experiences and behaviors.  *Id*.  It learned all the cases "reported direct exposure to one or both of the pools between July 30 and August 1, 2021," with no other common exposures to other likely sources, such as shared meals or food items.  *Id*. at 3.  Ten of the eleven cases were positive for the O157:H7 type, and the other case was negative "but presented with HUS after exposure."  *Id*.  Moreover, genome sequencing revealed the bacteria in six cases were genetically identical, "indicating a common source exposure."  *Id*. at 6.  Plaintiffs have satisfied the preponderance standard as to the basis of the opinion.

   3. "MSDH's conclusions lack sufficient reliability."

To be reliable under Rule 702, the MSDH report must be "grounded in the methods and procedures of science and . . . more than unsupported speculation or subjective belief."  *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Curtis v. M & S Petrol., Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)).  But "an alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself."  *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994) (quoting *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc).  The Park makes five reliability arguments that merit discussion.

***Whether MSDH tested other hypotheses.***  The Park contrasts MSDH's procedures to the CDC (Centers for Disease Control and Prevention)'s protocol for investigating waterborne-disease outbreaks, arguing that MSDH failed to test its hypothesis of an association between the pools and the outbreak.  Therefore, it says, the untested hypothesis cannot support an admissible opinion.  To test the hypothesis, the Park says MSDH should have done "case control studies, cohort studies, and statistical testing."  Park Mem. [413] at 12.  But the Park fails to explain what these methods are, what they could have shown, whether they were practicable on the given facts, and whether they would have cast doubt on MSDH's conclusion.  For example, the Park says MSDH should have tested the water, but by the time MSDH learned about the outbreak, the outbreak had already ended.  The Park does not show how the MSDH report is unreliable for lacking these additional methods.

In fact, the report shows MSDH did test its hypothesis that the outbreak came from the Jellystone pools.  Its investigation examined the typical avenues of *E. coli* infection and determined that none of the eleven cases had any common exposures besides the pools.  That was one test.  It also noted that no cases had been reported by anyone other than Jellystone attendees and that the children came from all over.  Yet another test of the hypothesis came when several samples' genomes proved identical, supporting a single source for the outbreak.  MSDH then considered whether contamination continued after Jellystone was closed for cleaning—it didn't.  Plus, there were no reported cases from anyone who had not been swimming in the Jellystone pools.

Given there was a single source and the only common exposure appeared to be the pools, the Court cannot say MSDH did not test its hypothesis.  It may not have tested it enough to satisfy every expert, but once the proponent shows by a preponderance of the evidence that an

expert "has a sufficient basis to support an opinion," the fact the expert did not do everything imaginable "will raise a question of weight and not admissibility." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.[2]

*Whether MSDH explored other possible causes.* The Park also says MSDH failed to explore other possible avenues of infection such as exposure to goose feces. Park Mem. [413] at 8. But an expert's opinion need not rule out every conceivable alternative explanation. *Viterbo*, 826 F.2d at 424; *see O'Neill v. Seariver Mar., Inc.*, 246 F. App'x 278, 281 (5th Cir. 2007) (citing *In re Paoli Ry. Yard PCB Litig.*, 35 F.3d 717, 761 (3d Cir. 1994) (holding expert "did not have to conduct every possible test" to "have good grounds" for opinion)). *See also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (stating "the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert") (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)). And the Park is simply incorrect as to avian-fecal exposure. MSDH's targeted questionnaire asked about "animal contact," including specifically "any contact with animal fecal materials." Pls.' Mem. (Smith) Ex. D [460-4] at 6.

---

[2]The Park argues that weight is no longer the correct question after the 2023 amendments to Rule 702. *See, e.g.*, Reply [487] at 2. Those amendments did address the weight issue, but not in a way that precludes these opinions. The advisory committee's notes state, "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The amendment occurred "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." *Id.* In other words, the proponent must first show by a preponderance of the evidence that the expert passes Rule 702 standards. *Id.* "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." *Id.* (stating, for example, "the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility").

*Whether MSDH satisfied other* **Daubert** *factors.*  Next, the Park argues MSDH failed to "subject[ ] its methods and findings to peer review, analyze[ ] the potential error rate of its techniques or conclusions, or incorporate[ ] standards and controls."  Park Mem. [413] at 13.  As stated above, the *Daubert* factors may not apply in every case, and the Park doesn't explain what "peer review" or "error rate" would mean in this context.

Regarding standards, the Park says MSDH rushed to a conclusion that the pools were "associated" with the contamination and merely sent some questionnaires to the infected children.  As noted, there was more to it, including genome sequencing.  In any event, Plaintiffs offer expert epidemiological testimony by Kirk Smith indicating that using the questionnaires followed "standard epidemiologic method employed by federal and state public health agencies nationally."  Smith Aff. [460-3] ¶ 9.  Smith also said the questionnaires were "commonly used" and "comprehensive as to exposure data and appropriately inquired, for all outbreak cases, as to exposures that have a scientifically known association with the transmission of *E. coli* O157:H7."  *Id.* ¶ 10 (italics added).[3]

*Whether MSDH ignored science.*  The Park says MSDH did not know that a properly chlorinated pool kills *E. coli* in less than a minute.  Park Mem. [413] at 6.  Had MSDH known that and reviewed the Park logs, it would have seen that its hypothesis regarding the pools defied science.  *Id.* at 7.  But that begs two obvious questions.  Were the logs correct, and would MSDH have been required to blindly credit them to the exclusion of the other facts?  MSDH's

---

[3] The Park urges the Court to disregard Smith's affidavit, claiming that it was "paid for" and that Plaintiffs cannot satisfy their admissibility burdens with Smith's opinions.  Reply [482] at 7 n.3. First, most experts are paid for.  Second, Plaintiffs must meet the admissibility requirements by a preponderance of the evidence.  Fed. R. Evid. 702.  The Park cites no case precluding a party from offering a retained expert's testimony to show that a non-retained expert's methods were reliable.

conclusions call those logs into doubt, as does the testimony of Plaintiffs' aquatics experts and fact witness James Goss. In short, there is a fact question whether those logs were reliable, and the failure to check them is not alone enough to preclude expert opinions.[4]

**Other factors.** The advisory committee's note to the 2000 amendment to Rule 702 identified more factors bearing on reliability, listed by one court as follows:

> whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); whether the expert has adequately accounted for obvious alternative explanations, *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994); whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); and whether the expert's claimed field of expertise is known to reach reliable results for the type of opinion the expert would give

*Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 815–16 (S.D. Tex. 2007).

MSDH did not create its report for litigation purposes. It was fulfilling its normal governmental responsibility well before litigation began. Its inquiry asked patients about alternative sources of exposure, and the report makes no logical leaps so faulty that they render its conclusion inadmissible. It is indeed part of the department's "regular professional work." *Id*.

**One opinion in MSDH's report is different.** The final sentence of the report states that the contamination came "possibly from an infected swimmer who was shedding bacteria, though

---

[4] The Park relies heavily on the logs throughout its *Daubert* and Rule 56 motions. The Court addresses that evidence in greater detail elsewhere and incorporates those findings here.

the actual source of contamination remains unknown."  MSDH Rpt. [412-6] at 6.  There is nothing in the report suggesting any testing or other basis for that conclusion, which makes it speculative.  That opinion will be stricken.

As for the rest, the Court has considered the Park's other reliability arguments and finds them redundant or otherwise lacking in merit.  Plaintiffs have met their burden to show reliability.

        4.      "MSDH's findings of an 'association' between the recreational water and the *E. coli* outbreak are irrelevant."

After reliability comes relevance.  Would the MSDH report "help the trier of fact to understand the evidence or to determine a fact in issue"?  Fed. R. Evid. 702.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 591–92.

The Park says MSDH found an "association" which is not enough to show causation.  Park Mem. [413] at 17.  For this claim, the Park cites mainly toxic-tort cases addressing general and specific causation.  The Court questions how relevant that analysis is here.  No one disputes that the *E. coli* subspecies in question *could* cause Plaintiffs to become ill (general causation) or that it *did* cause them some degree of illness (specific causation).  *See Knight*, 482 F.3d at 351.

Rather, the important issue is that MSDH, using ordinary epidemiological tools, found that every O157:H7 patient presenting after the subject weekend swam in the Jellystone pools and had no other common contacts.  It thus found it "likely" (not merely possible) the infection's source was the Park's "recreational waters."  MSDH Rpt. [412-6] at 8–9.  If that's true, then it rebuts the Park's main argument—that the pools could not have contained *E. coli* because they were always properly chlorinated.  The opinions are relevant.

The motion to exclude the MSDH report on Rule 702 grounds is denied, without prejudice to any other objection to its admissibility that may later arise.[5]

B.    Kirk Smith

Next, the Park asks to exclude the opinions of Kirk Smith, an epidemiologist trained in veterinary science who has investigated many disease outbreaks for his employer, the Minnesota Department of Health.  Smith Aff. [463-3] ¶¶ 2–6.  Plaintiffs offer his opinions to corroborate the methodology and conclusions of the MSDH report.

1.    Parroted Opinions

First, the Park says, "Smith offers one opinion in this case:  he 100% agrees with MSDH's investigation and conclusion that the pool/splashpad water at the Water Zone was the source of the *E. coli* outbreak."  Park Mem. [423] at 4.  It then accuses Smith of merely "parroting" the MSDH report.  *Id.*

Rule 703 allows an expert to rely "on facts or data in the case that the expert has been made aware of."  But opinions copied from other experts without "some independent investigation of the underlying opinions" are "inherently unreliable."  *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014).  In other words, an expert may not merely "parrot" what he has been provided.  *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013).

But Smith didn't do that.  First, he offered opinions regarding the reliability of MSDH's investigation based on his nearly 30 years of experience in the field.  *See* Smith Aff. [460-3]

---

[5] The Park raises two other arguments outside Rule 702.  It claims the MSDH report will confuse the jury between "association" and "causation" and is thus more prejudicial than probative under Rule 403.  The report is highly probative, and the Court will properly instruct the jury on causation.  The second argument is MSDH cannot be compelled to testify, but that issue is better left for trial because there is no indication MSDH would resist testifying.

¶¶ 9–11.  Those opinions parrot nothing.  Second, he testified that he reviewed the evidence himself, including evidence not available to MSDH, like depositions.  *See id.* ¶ 13; Smith Dep. [422-1] at 41–42.

That goes beyond simply adopting someone else's report.  Smith is an experienced epidemiologist whose opinion on the MSDH report may assist the trier of fact.  Independently corroborating another expert's opinion by consulting the same evidence that expert relied on— plus some—and comparing that opinion with one's own professional experience is not inadmissible "parroting."  *EEOC v. Mod. Grp., Ltd.*, No. 1:21-CV-451, 2024 WL 1290450, at *23 (E.D. Tex. Mar. 25, 2024).  And while the Park notes things Smith could have done—like reviewing the disputed pool logs—most of those arguments address causation opinions Smith has not offered.  The rest speak to the opinions' weight, assuming Plaintiffs meet the preponderance standard.

### 2.    Qualifications

The Park claims Smith is not qualified to offer his opinions on source, aquatics, or medical causation.

***Source opinions.***  To begin, there may be some disagreement over the term "source." Plaintiffs explain in their response that Smith's opinions relate to the cause and vector; he will not offer opinions about where the bacteria originated.  Pls.' Mem. [460] at 9.  So the motion will be granted to the extent it covers such opinions.  But the Park's arguments seem broader than that, noting Smith's testimony that the pools were the "source."  *See* Reply [476] at 4.

On that point, the Park asserts that epidemiology "is not [Smith's] expertise."  Park Mem. [423] at 5.  It later states that "Smith is not an epidemiologist" and has "admitted epidemiology was not his area of expertise."  *Id.* at 7.  The only support the Park ever cites for any of these

assertions is his testimony describing the four epidemiology units he manages as Deputy State *Epidemiologist* for the Minnesota Department of Health. *Id.* at 5 (citing Smith Dep. [422-1] at 13). That Smith manages various epidemiologist units—including the waterborne-disease unit— doesn't mean he lacks expertise in epidemiology, and he never "admitted" lacking this expertise.

To the contrary, Smith studied epidemiology as part of his formal education. Smith Aff. [460-3] ¶ 2. After that, he became an officer in the "epidemic Intelligence Service," the CDC's applied-epidemiology training program. *Id.* ¶ 4. Indeed Smith states that he has been working as an "epidemiologist continuously since 1996" and he has been with the Minnesota Department of Health since 1998, where he has participated in well over 1,000 confirmed outbreaks. *Id.* ¶¶ 5, 6. Though he is a manager, that is not an admission that he lacks expertise in epidemiology—the very work he oversees.

The Park's other qualifications arguments are better tethered to facts but are not enough to bar Smith's testimony. First, Smith "has not published in the area of recreational pool water as a vector for bacterial outbreaks." Park Mem. [423] at 5. But publication is not dispositive, and Smith has nearly three decades of relevant experience. *See* Fed. R. Evid. 702. Second, Smith could not name an investigation involving both bacteria and recreational swimming pools. Park Mem. [423] at 5. The Park says this makes the case like *Walker v. Caldwell*, its sole authority on this point. 603 F. Supp. 3d 449, 458 (N.D. Miss. 2022). There, a physician unqualified in emergency medicine was asked to pronounce on the standard of care in that field. *Id.* Smith's experience is far more relevant. He has studied *E. coli* and worked with such cases "every day for over 25 years." Smith Dep. [422-1] at 32. He also testified that his work includes several hundred bacterial investigations and 30 to 40 recreational-water investigations. *Id.* at 14, 16.

In sum, Smith's "source" opinions are within the field of epidemiology. And Plaintiffs have shown by a preponderance of the evidence that his scientific, technical, and other specialized knowledge in that field—gained over nearly 30 years—"will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The Park's arguments go to weight.

*Aquatics opinions.* Smith admits that pool maintenance and operation are not his "area of expertise." Smith Dep. [422-1] at 17. The Park therefore says his opinions in that area are inadmissible. It appears that Smith gave those opinions in response to the Park's deposition questions, and Plaintiffs say Smith will not offer aquatics opinions at trial. This portion of the motion appears to be conceded.

*Medical-causation opinions.* According to the Park, "Smith's general familiarity with disease outbreaks in animals does not qualify him in any way to offer opinions to a jury concerning the cause of Plaintiffs' *E. coli* infections." Park Mem. [423] at 6. Again, there is some agreement, but the parties seem to be talking past each other.

Plaintiffs say in response that Smith will not offer opinions regarding medical *causation.* Pls.' Mem. [460] at 10. But they claim he possesses the qualifications to say "whether each case/Plaintiff met an epidemiologic case definition of an *E. coli* O157 infection by looking at their diagnostic test results in the records, or, if they have hemolytic uremic syndrome (HUS), their clinical laboratory values in the records." *Id.* at 11 (quoting Smith Aff. [460-3] ¶ 17) (italics added). They cite his years of experience doing just that. *Id.* From that response, the Park replies that Plaintiffs concede the motion, and "[t]herefore, Smith should not be allowed to offer any opinions as to the Plaintiffs' medical diagnosis, prognosis, or that any Plaintiffs' symptoms

were 'compatible with' *E. coli.* O157:H7, or that the infections were "acquired at Jellystone." Reply [476] at 2.  That overstates the concession.

Starting with the common ground, Plaintiffs agree Smith will not address medical causation, like how the bacteria found its way into Plaintiffs' bodies.  The Court also sees no real dispute that Smith would not be allowed to address a Plaintiff's prognosis.  But the Park has not addressed Plaintiffs' evidence that Smith has substantial experience reading medical records and determining whether someone meets the definition of a person infected with *E. coli*.  As Smith explains, the epidemiological investigations build from that point, assessing data from the reported cases.  And in any event, there is no dispute in this case that Plaintiffs were infected.

The last supposedly conceded opinion relates to whether infections occurred at Jellystone.  That's an epidemiological rather than medical-causation opinion, and Plaintiffs never concede the motion as to that point—they dispute it.  Whether it is admissible will be addressed next.

3.    Epidemiology in General

According to the Park, even if Smith is an epidemiologist, epidemiology doesn't matter because it can't establish whether someone got sick from a given source.  Park Mem. [423] at 7. As Plaintiffs observe, that argument conflicts with the Park's separate motion to prevent Plaintiffs' aquatics expert from offering "any testimony on any causation or source issues, as *only* a specialist in disease transmission (such as a microbiologist, bacteriologist, medical doctor, *or epidemiologist*) possesses the required qualifications to do so."  Park Mem. (Osinski) [417] at 5–6 (emphasis added), *quoted in* Pls.' Mem. (Osinski) [470] at 2.

Beyond that, the Park offers one authority for excluding the opinion.  *See* Park Mem. [423] at 7 (quoting Michael D. Green *et al.*, *Reference Guide on Epidemiology*, *in* Federal

Judicial Center, *Reference Manual on Scientific Evidence* 549, 552 (3d ed. 2011)).  That reference states that "[e]pidemiology focuses on the question of general causation (i.e., is the agent capable of causing disease?) rather than that of specific causation (i.e., did it cause disease in a particular individual?)."  *Id.*  But the Park offers little explanation for this statement, especially in the context of this case where the Park admits "there is no doubt *E. coli* . . . did cause the Plaintiffs to be sick."  Reply [476] at 9.

What is unknown "is from what source did the Plaintiffs get exposed to *E. coli*."  *Id.*  Perhaps the cited quote speaks to this issue, but the Court would need some guidance before drawing that conclusion.  And, as Plaintiffs note, that same authority has more to say about causation.  Pls.' Mem. [460] at 12.  *See also United States v. Organic Pastures Dairy Co., LLC*, No. 1:08-CV-1786, 2024 WL 2701333, at *7 (E.D. Cal. May 24, 2024) (noting the CDC has said "epidemiological analysis" is relevant to identifying "the source of [an] outbreak" of bacterial infection) (quoting CDC report).

Anyway, both Smith and a witness for MSDH attest that this investigation fell squarely within the scope of what epidemiologists do.  The results may not be direct evidence of causation, but Plaintiffs have met their burden of showing by a preponderance of the evidence that Smith's opinions "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

       4.      Methodology

The Park says Smith's opinions are untested speculation, and it starts by repeating the claim that he did nothing more than parrot MSDH's report.  Park Mem. [423] at 7.  But as already noted, there is more to what he did.

Next, the Park says Smith should have recognized that MSDH failed to follow CDC-recommended steps for an epidemiological investigation. *Id.* at 8–9. In addition to the previous discussion of this point as to MSDH, Smith described how he would conduct a similar investigation in his own department, found MSDH's methods covered pretty much the same bases, and said additional steps weren't needed. Smith Dep. [422-1] at 27–29; Smith Aff. [460-3] ¶¶ 9–16.

That either Smith or MSDH could have done more does not render their opinions inadmissible. *See, e.g.*, Fed. R. Evid. 702 advisory committee's note to 2023 amendment (noting "the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility"). And again, it is incorrect to say Smith (or MSDH) completely failed to rule out other sources besides the pools. The point of the investigation was to identify possible sources and determine whether the cases shared contact with them. Only one common factor linked their cases: playing in the Jellystone pools.[6]

While the Court agrees Smith cannot offer opinions on aquatics or medical causation, those do not appear to be fields for which Plaintiffs offer his testimony. The Park's motion to exclude Smith's opinions is denied as to his opinions based on epidemiology.

C. Barbara Kloberdanz

The other two liability experts for Plaintiffs address whether the Park properly maintained its water facilities to keep the water clean of pathogens like *E. coli*. First, the Court addresses the motion to exclude [414] Barbara Kloberdanz. (The separate motion [440] filed by Leisure Systems, Inc., addressing just one of her opinions is resolved elsewhere.)

---

[6] The Park notes that Smith offered various answers about how the *E. coli* could have been introduced into the pools, Park Mem. [423] at 9, but he was merely answering questions at his deposition and has not offered those opinions.

1.    Causation Opinions

To start, the Park says Kloberdanz offers inadmissible opinions about what caused Plaintiffs to become ill.  Park Mem. [415] at 4.  Because Plaintiffs concede Kloberdanz will not offer causation opinions at trial, Pls.' Mem. [455] at 17, the Court excludes any such opinions.

2.    Possibilities Versus Probabilities

Kloberdanz testified that she was retained to consider the "possibility" of an *E. coli* outbreak in the pools despite the Park's practices.  Kloberdanz Dep. [414-3] at 69.  The Park therefore concludes that her resulting opinions are nothing more than "possibilities."  Park Mem. [415] at 5; Reply [475] at 3.  But just because Kloberdanz was retained to consider "possibilities" does not mean her resulting conclusions were mere possibilities.  Indeed, her report is not written in those terms and specifically says her opinions are held "to a reasonable degree of scientific certainty."  Kloberdanz Rpt. [455-16] at 4; *see also* Pls.' Mem. [455] at 18.

3.    Sufficiency of Supporting Facts

The Park's other objections are that Kloberdanz's opinions lack sufficient facts.  They address six areas.

***"Criticism of chemical test reading from documentation."***  The Park argues that its pool logs show sufficient chlorine levels during the outbreak weekend and that *E. coli* cannot exist given those levels.[7]  Kloberdanz criticizes the logs, but the Park says her opinions are only inadmissible "scenarios," Park Mem. [415] at 6, and then faults her for not accepting what the Park recorded, *id*. at 7.[8]

---

[7] This defense is addressed in more detail as it relates to liability issues in the summary-judgment order, which is incorporated.

[8] The Park also argues that her criticisms are unsupported because "Kloberdanz cannot say that any of these alleged issues led to the outbreak."  Park Mem. [415]  at 6.  But that relates to

As Plaintiffs note, Kloberdanz's opinion is the Park failed to test at all for many relevant factors, and as for the factors it did test, she says the pool logs have so many "inaccuracies, inconsistencies, and impossibilities" that nothing more than "scenarios" can be guessed at most of the time, including the subject weekend.  Pls.' Mem. [455] at 18.

According to Kloberdanz, merely measuring the amount of chlorine in the pool doesn't reveal whether the chlorine is disinfecting the water.  *Id*. at 19 (citing Kloberdanz Dep. [414-3] at 93).  For instance:  "If your pH is too high, your chlorine can be rendered ineffective."  Kloberdanz Dep. [414-3] at 87.  High temperature also can reduce chlorine's effectiveness.  *Id*. at 131–33.  The "oxidation reduction potential" (ORP) is relevant to whether the chlorine can kill pathogens.  *Id*. at 93.  And the number of bathers in a pool can affect water quality; Kloberdanz believes the pools were sometimes grossly overcrowded.  Kloberdanz Rpt. [414-2] at 10.  These alleged problems would be relevant to the accuracy and meaning of the logs, even if based in part on logs outside the days Plaintiffs visited.

In short, Kloberdanz (like Plaintiffs' other aquatics expert, Osinski) believes that for nearly any given day, including the subject weekend, nobody knows—nobody *can* know—from the pool logs whether the pools were safely chlorinated.  She bases that opinion on sufficient facts and data, and the opinions are relevant to the Park's logs-based defense.

***"The training at the Park."***  The Park says Kloberdanz doesn't have enough data to criticize its water managers' training.  Park Mem. [415] at 8.  For starters, the jury will need to be instructed that these opinions are not linked to causation.  But evidence of poor training would be relevant to issues like whether the logs are reliable.  The question is whether Kloberdanz

---

causation, an issue Kloberdanz will not address.  The testimony is instead relevant to the accuracy of the logs themselves, something the parties dispute and for which Kloberdanz's criticisms are adequately supported.

possessed sufficient information to render those opinions. The Court finds that she did, based on the facts recounted in Plaintiffs' memorandum. Pls.' Mem. [455] at 20–21 (quoting Kloberdanz Rpt. [414-2] at 4).

*"Improper state of mind opinions"*. Plaintiffs concede this criticism, so those opinions are excluded. *Id.* at 21.

*"Improper attempts to repeat" Osinski's opinions.* The Park objects to a calculation Kloberdanz cites that it says she got from Osinski. Park Mem. [415] at 11–12. As stated above, Federal Rule of Evidence 703 allows an expert to "base an opinion on facts or data in the case that the expert has been made aware of," but an expert may not merely "parrot" what she has been told without independent evaluation, *Factory Mut.*, 705 F.3d at 524. As Plaintiffs note, Kloberdanz said she had also made that calculation herself, and if Defendants wanted her to explain her math, they could have asked her at her deposition. Pls.' Mem. [455] at 22. Kloberdanz then used the calculations to build her opinion. *See Factory Mut.*, 705 F.3d at 524. The objection is overruled.

*"Bathrooms, changing tables, shower accessibility."* The Park says Kloberdanz cited no facts to support her opinion that these facilities were inadequate. Park Mem. [415] at 12. Plaintiffs point to a Park employee's testimony that the Park didn't require showers before entering the pools, didn't prohibit diaper-changing in the pool area, and didn't provide a shower facility in the aquatics area. Pls.' Mem. [455] at 23. Kloberdanz explained in detail the facts she believes support her opinions. Kloberdanz Dep. [414-3] at 150–60. Plaintiffs' met their burden.[9]

---

[9] The Park also argues that there is no evidence linking these concerns to the outbreak. Park Mem. [415] at 12. Kloberdanz had a basis for her opinions, so the Court will not yet strike these opinions. It will instead revisit the issue at trial when the context for the opinions is better known.

***"Alleged violations of policies and standards not related to outbreak."***  This objection covers two grounds.  First, the Park wants to exclude Kloberdanz's opinion on the Park's fecal-accident policy "because there is no evidence of a fecal accident during the Subject Weekend."  Park Mem. [415] at 13.  Plaintiffs say there is "no evidence" because the Park had no policy to log such events.  Pls.' Mem. [455] at 24–25.  Kloberdanz doesn't claim such an accident did occur on the days Plaintiffs visited the pools.  She does cite a CDC guideline for logging fecal accidents.  Kloberdanz Dep. [414-3] at 161.  And that might speak to issues like the adequacy of logging, though other potential objections might exist.  Rather than grant the Park's motion on this subject, the Court will allow it to submit a motion in limine that is more precisely tailored.

The second objection is to Kloberdanz's opinion that the Park violated the Model Aquatic Health Code.  The Park says those opinions are inadmissible because she never links them to what caused the *E. coli* outbreak.  Park Mem. [415] at 13.  To evaluate the opinions' relevance and reliability, the Court would need the Park to identify more specifically the challenged opinions.  Here too a motion in limine will be permitted.

Thus, the Court grants the motion as to Kloberdanz's opinions, if any, on what caused the *E. coli* outbreak and anyone's state of mind.  Otherwise, the motion is denied.

D.    Alison Osinski

The arguments for and against Osinski's opinions in the field of aquatics are much like those already discussed regarding Kloberdanz's opinions, starting with causation.[10]

---

[10] The Court does wonder whether, and how much, the opinions of Kloberdanz and Osinski may be cumulative, flagging that issue for the parties' later consideration.

1.    Causation

Osinski, like Kloberdanz, is not offered for what caused the pools to (allegedly) be infected with *E. coli*.  The Park's motion is granted as to any *E. coli* causation opinions.

But some opinions the Park addresses in its causation argument bleed into other subject areas.  For example, the Park says Osinski may not generally criticize its operations without offering competent expert opinions that the conduct she criticized proximately caused the outbreak, something she cannot do.  Park Mem. [417] at 6.

As with Kloberdanz, many of Osinski's criticisms are not offered to prove causation; they address the Park's claim that its pool logs prove the water was safe.  Osinski says they do "no such thing," Osinski Rpt. [416-2] at 25, an opinion she explained at length in her report and in her deposition, *see* Osinski Dep. [416-1] at 115–26.  For example, her report says no one took readings of combined available chlorine or ORP.  Osinski Rpt. [416-2] at 8.  "[A] free chlorine reading without a total chlorine reading is a waste.  Why did they even bother writing it down? It's worthless.  And without an ORP level, same thing; it doesn't mean anything."  Osinski Dep. [416-1] at 115.  The Park says these opinions are irrelevant unless she can show the chlorine levels were too low during the outbreak, Park Mem. [417] at 16, but that's Plaintiffs' point— because the Park failed to record all necessary data, the Park cannot say the water was safe.

In sum, any criticisms Osinski offered that relate to recordkeeping or the reliability of the pool logs would be relevant and reliable even without a causal connection to the outbreak because they cast doubt on the Park's logs-based defense.  And the basis for her criticisms of those issues does not appear to be in dispute at this point; the Park merely says she cannot offer them as "'contributing factor[s]' to the outbreak."  *Id*. at 6.

As for Osinski's other criticisms addressed in this section of the Park's memorandum, it does not analyze whether they are insufficient under Rule 702; it merely says Osinski never links them to causation. *Id.* As with Kloberdanz, the Court will need more context, but it finds for now that the opinions are sufficiently supported.

### 2. Whether Her Opinions Are Reliable

Beyond causation, the Park says Osinski's opinions on circulation, filtration, and chlorination are unreliable and inconsistent with the evidence. *Id.* at 11.[11]

***Circulation.*** Osinski opines that poor circulation in pools can lead to "dead spots" where the chlorine is ineffective. Osinski Dep. [416-1] at 270. She also says that dye testing should be done monthly to determine whether dead spots exist. *Id.* But she never conducted those tests to determine whether dead spots existed at the Park. The Park therefore says her opinions are untested and unsupported. Park Mem. [417] at 12.

The Park's arguments have some merit depending on the way Plaintiffs might wish to use the opinions. For example, the Court would not permit Osinski to testify that dead spots existed or that dead spots contributed to cause the outbreak. But Plaintiffs do not offer the opinions for those purposes. They hope to show that the Park should have known whether there were dead spots *before* the outbreak but didn't because it failed to test. Pls.' Mem. [470] at 5–6. And that speaks to whether the log results for the outbreak weekend are as failsafe as the Park maintains.

---

[11] The Park adds sanitation opinions to this list in its reply, but its opening memorandum never directly addresses that. The topic is in a block quote the Park offers to show that Osinski's causation arguments fall short. *See* Park Mem. [417] at 6. But when it lists the allegedly unsupported opinions, it includes only circulation, filtration, and chlorination. *See id.* at 11. The Park did not assert this issue in a way that would invite response, so Plaintiffs never mention it. "It is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs." *Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008). The Court follows that practice.

Osinski may be wrong about whether the Park should have tested the circulation, but that is a matter for cross-examination and opposing expert testimony at trial, not for the outright exclusion of her opinions. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Indeed, the basis for her testimony that circulation testing should have been performed is not presently disputed. She may testify regarding circulation issues consistent with this holding. But the Court will give a limiting instruction (if requested) to explain the opinion's limited purpose.

**Filtration.**  Osinski opined that the pools' filters were undersized, which might have contributed to the outbreak by allowing particulate matter removed from the water to overwhelm the system. Osinski Rpt. [416-2] at 14. As a result, the filters would need to be backwashed daily. *Id.* The Park says none of that should be admitted because Osinski misunderstood which filtration systems the Park employed and how they were configured.

Osinski's testimony signaled some uncertainty in these areas, but Plaintiffs say the Court should consider the full scope of her report and deposition testimony. *See* Pls.' Mem. [470] at 6. They also say the nature of the system is hotly disputed and that in any event whatever was used was too small. *Id.* The Court denies the motion for now without prejudice.

**Chloramines.**  According to the Park, "Osinski claims chloramine levels are also causing the free available chlorine to be less effective; however, she does not have enough information to say whether chloramines made a difference in this case." Park Mem. [417] at 22. The Park points to her deposition, where she explained that chloramine levels are calculated by subtracting total chlorine from free chlorine. *Id.* (citing Osinski Dep. [416-1] at 338:8–339:4). She then testified that the chloramine level on July 31 was 1.0 but should have been 0.2 or less, indicating

the chlorine could "not kill *E. coli* at the typical rate."  Osinski Dep. at 228 (italics added).  But

when asked whether she knew how long *E. coli* would have survived that day, she said, "No,

because I still don't have enough information."  *Id.* at 338–39.  The Park says that disqualifies

the opinions regarding chloramine levels.

Again, the Park has a point—to a point.  Osinski lacked enough information to link

chloramine levels to the outbreak, so she may not testify that those levels contributed to cause

the outbreak.  A limiting instruction would be proper.  But Plaintiffs offer the opinion for a

different purpose—to show why the Park cannot rely on its logs to definitively say chlorine

would have killed any *E. coli*.  Pls.' Mem. [470] at 9.  In that context, Osinski's testimony that

she lacked enough information to make a causal connection speaks directly to whether the Park

can rely on the logs to demonstrate the lack of a causal connection.

The question then becomes whether her testimony about chloramine levels is competent.

The Park says it's not because "there is not a consensus among the published literature and state

regulations as to levels of chloramines in pool water."  Park Mem. [417] at 23.  But even the

examples in the Park's memorandum indicate that "[c]hloraminated water may present a problem

with DPD testing of free chlorine concentration."  *Id.* (citing Hovis Dec. [416-6] ¶ 9(b) (quoting

Association of Pool and Spa Professionals fact sheet)).  That being Osinski's point, Plaintiffs surpass

the preponderance standard; the Park's arguments go to weight.[12]

---

[12] The Park cites one case in its chloramine discussion when a court excluded Osinski's opinions
for lack of testing, but the facts are too remote to draw any relevant parallels.  *See Maldonado v.
Walmart Store No. 2141*, No. CIV. A. 08-3458, 2011 WL 1790840, at *10 (E.D. Pa. May 10,
2011) (involving child who drowned in inflatable backyard pool).

3.        Industry Standards

According to the Park, "Osinski's description of 'industry standard' is a description of 'best' or 'optimal' behavior as opposed to what is reasonable." *Id*. at 24.  As it notes, the test in a negligence case is whether the practices were reasonable.  *Ewans v. Wells Fargo Bank, N.A.*, 389 F. App'x 383, 390 (5th Cir. 2010).  It also says other opinions are supported by nothing but her say-so, while others rely on a source Osinski finds less than optimal.  Park Mem. [417] at 26.

Working backwards, Osinski's testimony that the Model Aquatic Health Code (Model Code) is "wishy washy" doesn't make her opinions inadmissible.  Osinski Dep. [416-1] at 45.  Even if she thinks it could be better, she still testified that the Model Code "constitutes the standard of care in the recreational water industry for management and operation of recreational water facilities." *Id.*

As for the best-practices argument, the Park is correct that the legal standard is reasonableness.  But it does not seem that Osinski bases her opinions entirely on best practices.  Her report states that she considered the Park's actions based on industry standards and best practices.  *See, e.g.*, Osinski Rpt. [416-2] at 19.  Depending on the facts, those could be the same thing.  And as for the Model Code, she said that, although flawed, "it's the best thing we've got out there."  Osinski Dep. [416-1] at 45.  That's not the same as saying its recommendations are best practices that exceed what is reasonably expected.  In fact, she resisted calling the Model Code "best practices" during her deposition when the Park asked if it reflected best practices.  *Id*. at 50.  This is not enough to bar her from testifying, but the Park can make a timely objection if her testimony departs from the applicable standards.

Lastly, the Court had a difficult time aligning the party's arguments over whether Osinski based her industry-standards opinion on sufficient authority.  It seemed that much of her report

relied on codes and other authority, including the Model Code, but her testimony indicated that there are variations among those codes. That said, Osinski's opinions about these codes was not untethered from them, and she brings her own knowledge, training, and experience to the issue. On this record, the Court finds that Plaintiffs generally met the preponderance-of-the-evidence burden and will not strike her testimony outright.

So too for her opinions regarding bacteria testing. Even if the Park found a code that does not require it, Osinski's reliance on other codes meets Rule 702 and creates a weight issue. That said, it is not clear whether the opinions regarding pool draining and biocides are properly supported. A proper foundation would have to be laid before that testimony could be admitted.

In sum, the Court excludes Osinski's opinions on causation and will require a proper foundation before the jury hears testimony regarding filtration, biocides, and pool draining. Otherwise, the motion is denied.

IV.    Conclusion

The Court has considered all arguments presented. Any not specifically addressed here would not change the outcome. The Park's motions to exclude [412, 414, 416, 422] are granted in part and denied in part as set forth above.

**SO ORDERED AND ADJUDGED** this the 16th day of December, 2024.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE