UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AMY NEELY and DAVID NEELY
Individually and on Behalf of J.N., et al.                                                        PLAINTIFFS

V.                                                                    CIVIL ACTION NO. 3:21-CV-786-DPJ-ASH

GREAT ESCAPES PELAHATCHIE, LP,
d/b/a Jellystone Park Yogi on the Lake, et al.                                                 DEFENDANTS

ORDER

After several children caught a dangerous strain of the *E. coli* bacterium, they and their families sued a campground park and related entities, alleging the infection came from its swimming pools. The park's owner, general partner, and management company now move [434] for summary judgment on liability. The Court denies the motion.

I.      Background

Three Defendants bring this motion. Great Escapes Park Management, LP, owns the campground park. Mgmt. Agreement [457-8] at 1. Great Escapes Pelahatchie Management, LLC, says it is the owner's general partner. Park Mem. [435] at 1 n.1. The third moving Defendant is TJO 10x10 Management, LP, which has a management agreement with the owner. *Id*. at n.2. The motion never distinguishes these three as to their potential liability. The Court will call them "the Park."

The campground is named Jellystone Park Yogi on the Lake. Plaintiffs are seven children from six families who visited Jellystone at various times from Friday, July 30, to Sunday, August 1, 2021. Most Plaintiffs visited on a single day or overnight; all swam in the pools. Park Mem. [435] at 7. None of the families resided in the same town, and they came from three different states. *See* Neely Am. Compl. [407] ¶¶ 1–5. No one disputes these visits or that each child was

soon after diagnosed with the *E. coli* O157:H7 bacterium—as were four others who swam in the pools during that same three-day window.[1]

The main liability issue is whether the children were infected in the Jellystone pools. The Park says that's "impossible" because its pool logs show its employees properly chlorinated the water while Plaintiffs offer no contrary evidence. Park Mem. [435] at 2. On that general basis, the Park seeks summary judgment. Plaintiffs argue otherwise and claim their record evidence creates a factual dispute for the jury. The Court has both personal and subject-matter jurisdiction over this diversity dispute, and the summary-judgment motion has been fully briefed.

II.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute over any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Catrett*, 477 U.S. at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts

---

[1] "Unlike the harmless *E. coli* bacteria commonly found in human intestines, *E. coli* O157:H7 produces Shiga toxins, which cause inflammation of the colon and large intestine, resulting in stomach cramps and bloody diarrhea. Hemolytic uremic syndrome is a severe complication of *E. coli* O157:H7 infection that can cause anemia and kidney damage." *Am. Home Assur. Co. v. Greater Omaha Packing Co.*, 819 F.3d 417, 420 (8th Cir. 2016).

2

showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014). But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

III.   Discussion

The Second Amended Complaint (SAC) pleads negligence, premises liability, and gross negligence. But gross negligence is pleaded against only Leisure Systems, Inc., whose separate summary-judgment motion is addressed by a separate order.[2]

  A.   Mississippi Law on Premises Liability and Negligence

Plaintiffs' allegations track closely under both premises liability and negligence. For a negligence claim,

> the "plaintiff must establish by a preponderance of the evidence each of the elements of negligence: duty, breach, causation and injury." Further, the plaintiff must show "a causal connection between the breach and the [injury], such that the breach is the proximate cause of the [injury]." The plaintiff must first prove the existence of a duty owed, then "[t]he elements of breach and proximate cause

---

[2] Plaintiffs concede they make no res ipsa loquitur claims, Pls.' Mem. [457] at 19, so the Park's argument on that score need not be addressed.

3

> must be established . . . with supporting evidence. Duty and breach of duty, which both involve foreseeability, are essential to finding negligence and [therefore,] must be demonstrated first."

*Sanderson Farms, Inc. v. McCullough*, 212 So. 3d 69, 76 (Miss. 2017) (citations omitted).

"[P]remises liability is a theory of negligence that establishes the duty owed to someone injured on a landowners's premises as a result of 'conditions or activities' on the land." *Double Quick, Inc. v. Moore*, 73 So. 3d 1162, 1165 (Miss. 2011) (quoting *Doe v. Jameson Inn, Inc.*, 56 So. 3d 549, 553 (Miss. 2011)). For a premises-liability claim, "the plaintiff must prove each element of negligence." *Venture, Inc. v. Harris*, 307 So. 3d 427, 432 (Miss. 2020) (quoting *Bailey Lumber & Supply Co. v. Robinson*, 98 So. 3d 986, 993 n.3 (Miss. 2012)).

Also, a premises-liability case must show the injured person's status as invitee, licensee, or trespasser, as well as determine what duty that status implies. *Id*. (citing *Leffler v. Sharp*, 891 So. 2d 152, 156 (Miss. 2004)). The parties agree Plaintiffs were invitees, so the Park's duty was "to keep its premises in a reasonably safe condition and to warn of dangerous conditions which are not readily apparent to the invitee." *Lasseter v. AWH-BP Jackson Hotel, LLC*, 380 So. 3d 232, 236 (Miss. 2024) (quoting *Drennan v. Kroger Co.*, 672 So. 2d 1168, 1170 (Miss. 1996)); *see* Park Mem. [435] at 10.

"There is no liability when the injured party fails to show a dangerous condition." *Lasseter*, 380 So. 3d at 237. But "[n]o proof of the business owner's or operator's knowledge of a dangerous condition is necessary when the dangerous condition was created by the owner's or operator's negligence or the negligence of someone under its authority." *Id*.

B. Premises Liability

The Park frames its summary-judgment arguments in its opening memorandum:

> Plaintiffs theorize that the water was insufficiently chlorinated, allowing *E. coli* to survive in the pool and/or splashpad for three days, thus creating a dangerous condition that led to their exposure. Two material indisputable facts defeat

4

> Plaintiffs' liability theory: (i) there is no evidence of action or inaction of GEP that could have caused *E. coli* to be present in the water; and (ii) the only evidence of chemical levels on the days of exposure show that the water was sufficiently chlorinated, making it scientifically impossible for the treated water to have been the source of Plaintiffs' exposure, because *E. coli* cannot survive longer than 60 seconds in minimally chlorinated water.

Park Mem. [435] at 2. The parties agree chlorine can kill *E. coli*, but the rest is far from "indisputable."

Starting with breach of duty, the Park says "[t]his case is a classic example of the basic legal principle that the mere occurrence of an injury on one's property is not a sufficient basis to impose liability on the property owner." *Id.* at 1. That's generally true. *Patterson v. T.L. Wallace Constr., Inc.*, 133 So. 3d 325, 332 (Miss. 2013). But the science behind the Park's primary defense changes that analysis.

No one disputes that *E. coli* exposure presents a well-known risk. Nor does the Park dispute that it had a duty to maintain the swimming waters in a way that prevented an *E. coli* outbreak, which can be accomplished with proper chlorination. According to the Park, "water with at least 1 ppm of free chlorine is sufficient to kill *E. coli* bacteria 'within seconds.'" Park Mem. [435] at 8 (quoting Kloberdanz Dep. [434-18] at 84; Smith Dep. [434-19] at 44). The Park then claims that because the pools were properly chlorinated, *E. coli* exposure was "impossible," leaving no proof of negligence. *Id.* at 2.

But the opposite would also be true. If *E. coli* bacteria did exist in the pools at levels sufficient to infect the seven Plaintiffs (plus four others) over three days, then that offers circumstantial proof the Park failed to maintain proper chlorine levels. This *modus tollens* analysis does not, as the Park suggests, require stacking inference upon inference.

So, the first real question is whether the pool waters were in a dangerous condition when Plaintiffs visited Jellystone. As said, the Park finds that "impossible" because its "pool logs—the

5

only contemporaneous evidence of the water's chlorination levels—show sufficient levels of chlorine in the pool and splashpad during the subject weekend." *Id.* at 14. That argument overstates the logs and discounts the record evidence.

*__The Park's logs.__* The Park says its pool logs prove the free chlorine in the pools never fell below 1 part per million (ppm) while Plaintiffs visited, thus making exposure impossible. *Id.* at 8. It summarizes those readings in this chart:

| Date | Pool/Splash | Free Chlorine ppm | Total Chlorine | pH | CYA |
|---|---|---|---|---|---|
| July 30 PM | Pool | 4 | Not recorded | 7.8 | 30-50 |
| July 30 PM | Splash | 5 | Not recorded | 7.8 | 30-50 |
| July 31 PM | Pool | 7 | 8 | 7.2 | 40 |
| July 31 PM | Splash | 2 | 10 | 7.2 | 0 |
| Aug 1 AM | Pool | 1 | Not recorded | 7.8 | Not recorded |
| Aug 1 AM | Splash | 1 | Not recorded | 7.8 | Not recorded |

*Id.*

For starters, the Park claims its "operators used a Taylor Test Kit for morning and evening tests." *Id.* at 5. Yet the free-chlorine readings upon which the Park so heavily relies were recorded only once a day. *Id.* at 8. That creates a question whether the free-chlorine levels were proper throughout Plaintiffs' stays. The Park also recorded no total-chlorine levels for two of the three days when the children were exposed. *Id.* Plaintiffs' aquatics expert Dr. Alison Osinski testified that without that information, the free-chlorine levels are "worthless." Osinski Dep. [416-1] at 115. She also testified that oxidation reduction potential (ORP) levels would be necessary to determine whether the water is safe, yet none were recorded. *Id.* at 115–117.

6

Aside from the missing data, Osinski and another aquatics expert (Barbara Kloberdanz) offered admissible opinions that the reporting was flawed in other ways, including testimony that some recorded results were chemically impossible. *See, e.g.*, Osinski Rpt. [457-1] at 8. Plaintiffs also note that Park employee James Goss was asked about improbable results and responded that they could come from "human error." Goss Dep. [457-2] at 35.

Plaintiffs devote nine pages to this subject in an earlier memorandum, cataloging and citing record evidence that challenges the accuracy of the pool logs. *See* Pls.' Mem. re: Kloberdanz Mot. [455] at 8–17. There is no need to revisit every fact here. Based on what is addressed in this Order, and in the Court's *Daubert* rulings on Osinski and Kloberdanz, Plaintiffs have created a fact question whether the logs are accurate.[3]

So, while a jury could accept the Park's arguments about the logs, the Court must view that evidence in the light most favorable to Plaintiffs. *Rite Way Serv.*, 819 F.3d at 239. And in that light, the logs and other evidence about the Park's equipment are not enough to establish—as a matter of law—that the chlorine levels in the pools remained high enough during Plaintiffs' visits to kill any *E. coli* they may have encountered.

***Existence of a dangerous condition.*** Having created a jury question whether the pool logs are accurate and definitively prove the chlorine levels make exposure impossible, Plaintiffs must next create a jury question whether the pools presented a dangerous condition from

---

[3] The Park also claims to have tested the waters "throughout the day" and says its "automated controllers were constantly testing the water." Park Mem. [435] at 5. But the only results in evidence are the incomplete and factually disputed logs. There are also factual disputes over the equipment. For instance, the Park bases this argument on its employee Baumer's declaration that "the automated controllers were constantly testing the water." Baumer Dec. [434-2] ¶ 12. Yet it is unclear whether he was present when the children were exposed, and other Jellystone employees testified that the equipment would sometimes shut itself down, perhaps for unexplained power surges. Ammons Dep. [434-1] at 20; Goss Dep. [457-2] at 4.

insufficient chlorine.  Here again, the Park says "no proof" of that exists.  Park Mem. [435] at 17.  But Plaintiffs have offered facts—including expert opinions—that must be considered in the light most favorable to them.

Beginning on August 6, 2021, after a hospital reported an *E. coli* O157:H7 patient, the Mississippi State Department of Health (MSDH) investigated the outbreak.  MSDH Rpt. [412-6] at 2.  Using a "standard *E. coli* Hypothesis Generating questionnaire," the agency "interviewed all potential cases" to identify possible sources of the bacteria.  *Id*.; *see* [460-4] (example questionnaire).  MSDH identified eleven persons found to have either *E. coli* O157:H7 or (in one case) hemolytic uremic syndrome, all "report[ing] direct exposure to both the pool and the splashpad between July 30 and August 1, 2021."  MSDH Rpt. [412-6] at 3.

Those facts alone would likely fail to prove the water was dangerous, because the eleven children might have been exposed in another common way, like eating food from the same infected source.  But MSDH considered other possible sources to determine whether the children had any of them in common.  It found "[n]o common meals, food or other common exposures."  *Id*.  And no cases were reported that did not have direct exposure to the pools.  *Id.* at 1.  Further, there were no reported cases after the pools were drained and cleaned.  *Id.*  On top of that, cultures from six cases proved to be genetic matches, "indicating all the infections were from one common source exposure."  *Id.* at 5.  The agency found the outbreak was likely linked to the swimming pools.  *Id.* at 1.

This report is admissible, and it does not stand alone.  Plaintiffs also offer Dr. Kirk Smith, Deputy State Epidemiologist for the State of Minnesota and Manager of the Foodborne, Waterborne, Vectorborne and Zoonotic Diseases section of the Minnesota Department of Health.  He "consider[ed] all ecologically plausible exposures, but there were no exposures other than the

water features at Jellystone that could have explained even half of the cases." Smith Aff. [460-3] ¶ 16.

The conclusions from MSDH and Dr. Smith linking the *E. coli* to the pools gain greater force because Plaintiffs visited on three different days and came from different towns in three different states, yet they all apparently contracted the same *E. coli* O157:H7 strain. A single infection could be sheer happenstance, but eleven swimmers over three days? A reasonable jury could find those facts point to a dangerous condition. *See Gross v. King David Bistro, Inc.*, 84 F. Supp. 2d 675, 678 (D. Md. 2000) (finding that similar epidemiological investigation "provided persuasive scientific support" to infer that infections were caused by eating same menu item but that opinions about who or what caused item to be tainted were "untrustworthy").

This single intersection of contacts by the only eleven people to be infected is not merely a "temporal connection between a plaintiff's injury and exposure to the defendant's property" as the Park suggests. Reply [483] at 6 (citing *McGinty v. Grand Casinos of Miss., Inc.-Biloxi*, 245 So. 3d 444, 449 (Miss. 2018); *Goodwin v. Misticos*, 42 So. 2d 397, 400–03 (Miss. 1949); *Masonite Corp. v. Hill*, 154 So. 2d 295, 296–97 (Miss. 1934); *Walker v. Cellular S. Inc.*, 309 So. 3d 16, 25 (Miss. Ct. App. 2020) (injury within business is not enough to show negligence by proprietor)). Yes, temporal proximity lines up, but there is more to it. All eleven swam in the Jellystone pools, were exposed to the same bacteria, and shared no other known exposure risks.

In short, Plaintiffs need not offer direct evidence that the pools were in a dangerous condition—a circumstantial case will do. *Clinton Healthcare, LLC v. Atkinson*, 294 So. 3d 66, 72 (Miss. 2019) ("Negligence 'may be found from circumstantial evidence of adequate probative value.'") (premises-liability case) (quoting *Miss. Winn-Dixie Supermkts. v. Hughes*, 156 So. 2d 734, 736 (Miss. 1963) (same)). And viewed in the light most favorable to Plaintiffs, their record evidence creates a material dispute whether a dangerous condition existed in the Park's pools due

to under-chlorination. If a jury finds that to be so, then it could also find the Park created that dangerous condition by failing to maintain proper chlorine levels. As the Park argues, there can be no *E. coli* exposure with proper chlorination. The Park's summary-judgment motion on premises liability is denied.

  C.  Negligence

Last comes negligence. The Park's argument against a standalone negligence claim focuses on negligent training and denies Plaintiffs have presented any evidence to support such a cause of action. According to the Park, "[t]o succeed on a negligent training claim Plaintiffs must show a breached duty that led to insufficient chlorination of the swimming pool or splashpad during the Subject Weekend, and . . . no such proof exists." Park Mem. [435] at 20. The Court has already found a fact question whether the Park's employees kept the pools properly chlorinated, and Plaintiffs' aquatics experts have offered enough evidence to create a fact question whether the employees were properly trained to test and maintain the chlorine levels.

That said, the Park pivots in its reply, arguing instead that a negligent-training claim would be redundant because it has admitted its employees acted within the course and scope of their employment. Reply [483] at 2. The Park's authority for that argument is easily distinguishable. In *Deliefde v. Nixon*, this Court held that claims like negligent training would be "unnecessary and duplicitous" to vicarious-liability claims against the employer. No. 3:19-CV-226-DPJ-FKB, 2021 WL 4164680, at *8 (S.D. Miss. Sept. 13, 2021). But unlike the Park, the *Deliefde* defendant "conceded that [its driver's] simple negligence occurred within the course

10

and scope of her employment and proximately caused the crash, thus admitting its vicarious liability." *Id.* at *6.

In any event, because the Park made this argument first in reply, Plaintiffs never had a chance to respond. The Park's authority has not, therefore, been tested under the present facts. The Court will not consider it now because "[i]t is the practice of . . . the district courts to refuse to consider arguments raised for the first time in reply briefs." *Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008). Without resolving the legal question whether they are distinct torts on the present facts, the Court can at least rule the Park has not shown it is entitled to summary judgment for lack of evidence.

IV.     Conclusion

The Court has considered all arguments presented. Any not specifically addressed here would not alter the outcome. The motion for summary judgment [434] is denied.

**SO ORDERED AND ADJUDGED** this the 16th day of December, 2024.

s/ *Daniel P. Jordan III*  
UNITED STATES DISTRICT JUDGE