UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

AMY NEELY and DAVID NEELY
Individually and on Behalf of J.N., et al.                                                    PLAINTIFFS

V.                                                        CIVIL ACTION NO. 3:21-CV-786-DPJ-ASH

GREAT ESCAPES PELAHATCHIE, LP,
d/b/a Jellystone Park Yogi on the Lake, et al.                                          DEFENDANTS

ORDER

In this case arising from alleged contaminants at a water park, Plaintiffs sue (among others) the park's franchisor, Leisure Systems, Inc. (LSI), which now asks for summary judgment [445] and the exclusion [440] of certain opinions from Barbara Kloberdanz, one of Plaintiffs' designated aquatics experts. The Court grants both motions and dismisses LSI from the case.

I.   Background

Eleven children contracted a dangerous strain of the *E. coli* bacterium in 2021. *See generally* Second Am. Compl. [407]. Plaintiffs say they contracted it in two pools at the Jellystone Park Yogi on the Lake (Jellystone) camping resort in Pelahatchie, Mississippi. *Id*. ¶ 25. The park holds a franchise agreement with LSI, and the main issue in these motions is whether LSI owed Plaintiffs a duty to make the pools reasonably safe.

LSI "holds an exclusive license from Hanna-Barbera Productions, Inc., to use the name, character, symbol, design, likeness and visual representation of Yogi Bear and other trademarks and service marks . . . in connection with the construction, operation and franchising of campgrounds and resorts." Franchise Agreement [445-2] at 3 (ECF pagination). In 2019, LSI

extended a franchise agreement to Jellystone's owner.  Def.'s Mem. [446] at 3 (noting franchise transfer from previous park operator).

As part of this franchise agreement, LSI sets general conditions on Jellystone's operation. *See id*.  But the agreement specifies that the franchisor and franchisee are independent contractors and not each other's agents, partners, employees, etc.  *Id*. at 14.  The park owner is obliged to "keep all facilities," including "pools," "in prime condition," and its operation of the park must meet "all procedures prescribed by [LSI] and the highest levels and standards of quality and cleanliness."  *Id.* at 6.

Although LSI set many quality-assurance standards in its 800-plus page Brand Standards Manual, it prescribed no details for pool chlorination and assumed no control over the pools' day-to-day operations and maintenance.  And that is precisely where Plaintiffs find fault.  They say LSI knew about proper pool maintenance but shut its eyes to whether the franchisee was keeping the water safe.  Pls.' Mem. [472] at 2.  This, they say, breached the duty of care a franchisor owes invitees, at least according to Plaintiffs' expert, Barbara Kloberdanz.  LSI seeks orders striking Kloberdanz's franchisor-related opinions and granting summary judgment.  The Court will address the expert motion first.

II.     Motion to Strike Kloberdanz

In a separate order, the Court ruled that Kloberdanz may offer most of her aquatics opinions.  That order provides a detailed description of the standards that will be applied here.  Generally, Federal Rule of Evidence 702 allows relevant, reliable opinion testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education."  The burden to show a witness meets this test rests with the proponent, and it must be shown by a preponderance of the evidence.  Fed. R. Evid. 702.

Plaintiffs say Kloberdanz's expertise exceeds aquatics and extends to the standard of care for branding franchisors like LSI. Broadly stated, Kloberdanz concludes that LSI "departed from clear industry standards that required . . . steps to ensure that the instructions given to [Jellystone] about recreational water management were complete and scientifically accurate, and to regularly inspect or audit the park for compliance with defined standards." Kloberdanz Rpt. [472-6] at 3. According to Kloberdanz, "[n]umerous franchises maintain their safety standards by holding their franchisees accountable for all operational aspects of their aquatic facilities." *Id.* at 11. And she takes particular aim at LSI's Brand Standards Manual, which provided detailed instructions to franchisees but failed to offer detailed requirements for water management. *Id.* at 7.

LSI says Kloberdanz lacks any qualifications related to the duties imposed on franchisors and that her opinions about industry standards are unreliable. As it puts it, even if Kloberdanz "has broad experience in water safety, . . . she has no knowledge of business structure, and how the law differentiates between owner/operators, and franchisors." Reply [488] at 1.

Starting with her qualifications, Plaintiffs have identified no education, training, or experience Kloberdanz may possess about franchise issues. She does, however, claim to have knowledge about three companies that operate recreational-water attractions in multiple locations—Great Wolf Lodge, Water Country, and Hyatt Regency. Kloberdanz Rpt. [472-6] at 12. Kloberdanz says all three maintained comprehensive water-safety programs. *Id.*

Plaintiffs say this is enough to qualify Kloberdanz as an expert on franchisor duties. To make their point, they rely mainly on *Wilbern v. Culver Franchising System, Inc.*, when the court qualified an expert on franchisee-franchisor relationships, correctly rejecting the argument that an expert must have formal education about a subject to qualify under Rule 702. No. 13-C-3269,

2015 WL 5722825, at *8–9 (N.D. Ill. Sept. 29, 2015).  But the expert in *Wilbern* had significant experience in franchise issues.  He was a member of the American Association of Franchisees and Dealers, had published "numerous articles" on franchise issues, and had been retained "as an expert or consultant" on "legal matters" concerning "franchisor-franchisee disputes."  *Id.* at *8.  In fact, the opposing party eventually conceded that the expert was "qualified to testify regarding franchise matters," though it quibbled over his opinions.  *Id.* at *9.

Kloberdanz by comparison has no known experience with franchise issues.  As for her examples, she appears to have done work for only one of them, Hyatt.  Kloberdanz Dep. [414-3] at 112.  But that retention had no apparent connection to Hyatt's duties as a franchisor.  *Id.*  For the other two examples—Great Wolf Lodge and Water Country—she bases her opinions on presentations she attended or gave about their water-management procedures.  *Id.*  But she does not say whether those presentations mentioned industry standards for franchisors—like LSI—that have agreements with owner/operators.  *Id.*

In fact, Kloberdanz has never read any of the franchise agreements for the companies she cites—assuming those agreements exist.  *Id.*  And she knows nothing about the companies' business structures.  *Id.* at 192–94.  She could not, for example, say whether the locations were independently owned and operated as was Jellystone.  *Id.* at 194, 203–04.  Instead, she acknowledged that "[t]he biggest standard that we're looking at is the industry standards for aquatics facilities."  *Id.* at 204.  In other words, she seems to base her opinions about industry standards for franchisors on the general standards that apply to aquatics facilities.

Plaintiffs acknowledge these gaps but say that "regardless of their chosen business forms or structures," the three examples all "have uniform and comprehensive standards for their waterparks."  Pls.' Mem. [471] at 8.  That may be factually true, but it's legally insufficient.

4

Plaintiffs cannot show Kloberdanz is an expert in the standard of care applied to franchise agreements like the one here without showing some "knowledge, skill, experience, training, or education" in franchise agreements or industry standards for such franchisors. Fed. R. Evid. 702. *See, e.g.*, *Braucher ex rel. Braucher v. Swagat Grp., L.L.C.*, 702 F. Supp. 2d 1032, 1042 (C.D. Ill. 2010) (excluding aquatics expert's opinions on franchisor's duty to prevent infections from pool).

Even if Kloberdanz were qualified, her opinions are unreliable. As noted above, she cites three examples without knowing anything about those companies' business models, and she generally looks to basic principles of water management rather than the more precise issue presented. Plus, the Court questions whether these three examples are enough to show an industry standard. Finally, as addressed next, her opinions about the standard of care for franchisors could be viewed as a legal opinion that conflicts with the consensus position from courts and commentators who have considered those duties.

In any event, Plaintiffs have not met their burden of showing by a preponderance of the evidence that Kloberdanz is qualified to give opinions on franchisor duties or that her opinions are reliable. For these reasons, the Court grants LSI's motion to exclude her opinions on the duty it owed as franchisor to Jellystone.

III.   Motion for Summary Judgment

    A.   Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case[ ] and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Catrett*, 477 U.S. at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citation omitted). In reviewing the evidence, factual controversies are to be resolved for the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant." *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014). But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

  B.  The Claims

Up front, Plaintiffs concede their "franchisor and premises liability claims." Pls.' Mem. [472] at 1. LSI's motion is granted as to those. But they argue that LSI was directly negligent—indeed grossly negligent—for failing to make the pools safe despite having superior knowledge
6

of pool-safety issues. *Id*. To that, LSI says it faces no such duty because it is merely a franchisor.

                1.      Procedural Arguments

Plaintiffs make two procedural arguments to head off a merits analysis. Neither would prevent summary judgment.

***Waiver.*** Plaintiffs believe LSI waived any arguments related to direct liability by failing even to brief the issue in its opening memorandum. But LSI did address it. Aside from moving to dismiss all claims, LSI specifically argued that it could not be held directly liable for "withholding information and knowledge" from Jellystone. Def.'s Mem. [446] at 19. It also stated, "Simply put, because LSI owes no legal duty to Plaintiffs for the operation of the pool and splash pad, LSI cannot be held liable as a matter of law." *Id.* And elsewhere in its opening brief, LSI cites a case that turned on whether a hotel's franchisor owed a *direct* duty to guests. *Id*. at 12–15 (discussing *Braucher*, 702 F. Supp. 2d at 1039, 1044). Unlike in some rebuttal arguments in this case, LSI said enough to put the direct-liability issue before the Court, and Plaintiffs had an opportunity to respond. Which they did. The issue was not waived.

***Effect of Order granting leave to amend.*** Plaintiffs also say LSI's summary-judgment motion is precluded because the Court granted Plaintiffs leave to add a gross-negligence claim in the Second Amended Complaint after finding that it would not be futile. Pls.' Mem. [472] at 3–4. According to Plaintiffs, their motion for leave to amend was based on the same law and same undisputed facts that now defeat summary judgment, so granting summary judgment "would require this Court to hold that it had originally erred when it granted Plaintiffs' Motion for Leave to Amend." *Id.* at 4.

7

True enough, the Court did state—with neither analysis nor explanation—that the amendment adding gross negligence would not be futile. But the Court more fully set out its primary basis for granting leave under the generous Rule 15(a) standard—LSI was already defending against negligence, so adding gross negligence would not materially prejudice it. Order [406] at 4. Though the Court did not discuss why it said the new claim would not be futile, the holding necessarily decided that the claim was merely plausible under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That standard "'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The Court believed that Plaintiffs should have an opportunity to fully develop their theory. Now, under Rule 56, they are required to go beyond the pleadings and create a material dispute with record evidence. *Catrett*, 477 U.S. at 324.

In any event, because the Order was interlocutory, "the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990) (citing Fed. R. Civ. P. 54(b)). The Court now considers the issue anew under Rule 56 based on Plaintiffs' cited evidence and the available legal authority. *See* Fed. R. Civ. P. 56(c)(1)(A).

      2.      Direct-Negligence Claim

Plaintiffs say LSI is directly liable for its own acts and omissions related to water safety at Jellystone. To consider that claim, the Court looks to Mississippi law under choice-of-law principles. *Grenada Steel Indus., Inc. v. Ala. Oxygen Co.*, 695 F.2d 883, 885 (5th Cir. 1983). The Court thus begins where Mississippi's negligence law begins— whether LSI owed a duty to

Plaintiffs. "Whether a duty exists in a negligence case is a question of law to be determined by the court." *Belmont Homes, Inc. v. Stewart*, 792 So. 2d 229, 232 (Miss. 2001).

According to Plaintiffs, LSI owed them the "common-law duty imposed on everyone to conform his voluntary actions to a standard of reasonable care." Pls.' Mem. [472] at 10. They cite the general rule that "every person who undertakes the performance of an act—which, it is apparent, if not done carefully, will be dangerous to other persons, or the property of other persons—[has] the duty to exercise his senses and intelligence to avoid injury." *Id*. (quoting *Dr. Pepper Bottling Co. of Miss. v. Bruner*, 148 So. 2d 199, 201 (Miss. 1962)); *see also Hawkins v. Heck Yea Quarter Horses, LLC*, 249 So. 3d 400, 405 (Miss. 2018) (holding that premises owner who voluntarily renders care to injured party must act reasonably). But as the Fifth Circuit pointed out, *Dr. Pepper* does not "require [a defendant] to protect plaintiff . . . from harm from any force(s) that [defendant] did not set into motion." *Deramus v. Jackson Nat'l Life Ins. Co.*, 92 F.3d 274, 279 (5th Cir. 1996).

Aside from this general law, Plaintiffs cite no binding authority that explains when a franchisor crosses the line and becomes a voluntary actor subject to the duty of reasonable care in a direct-negligence case. Defendants likewise offer no binding authority, and the Court found none.

This presents an *Erie* question. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Court must therefore determine, in its "best judgment, how the [Mississippi Supreme Court] would resolve the issue if presented with the same case." *Temple v. McCall*, 720 F.3d 301, 307 (5th Cir. 2013) (quoting *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009)). To do so, the Court considers

> decisions of the [Mississippi] Supreme Court in analogous cases, (2) the
> rationales and analyses underlying [Mississippi] Supreme Court decisions on

9

> related issues, (3) dicta by the [Mississippi] Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which [Mississippi] courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Guilbeau v. Hess Corp.*, 854 F.3d 310, 312 n.4 (5th Cir. 2017) (quoting *Gulf & Miss. River Transp. Co. v. BP Oil Pipeline Co.*, 730 F.3d 484, 488–89 (5th Cir. 2013)).

***Mississippi authority.*** As discussed, Mississippi does recognize that persons who voluntarily act must use reasonable care not to injure others. *Hawkins*, 249 So. 3d at 405. But that does not answer when a franchisor has a duty to the franchisee's invitees. Neither party cites a Mississippi Supreme Court case touching that point.

LSI therefore urges the Court to rely on a case from the Mississippi Court of Appeals, *Allen v. Choice Hotels International*, that addressed franchisor liability and held that it depends on control over the franchise. LSI Mem. [446] at 6 (citing 942 So. 2d 817 (Miss. Ct. App. 2006)). *Allen* is different because it is not a direct-liability case. It addressed "traditional agency analysis" and affirmed the circuit court's finding that "the franchisor was not vicariously liable." 942 So. 2d at 820.

That doesn't mean, however, that *Allen* has nothing to offer. One familiar legal reference explains that the "primary consideration" in franchisor-liability cases is the same "under either an agency theory or general negligence theory"—"the degree of control the franchisor has over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm." 65A C.J.S. *Negligence* § 438. *See also Bender v. Hilton Domestic Operating Co.*, No. 2:19-CV-271, 2021 WL 1401494, at *2 (M.D. Ala. Apr. 14, 2021) (holding that analysis for franchisor liability is "indistinguishable" under vicarious or direct-liability theories) (collecting cases and citing Joseph H. King, Jr., *Limiting Vicarious Liability of Franchisors for the Torts of Their Franchisees*, 62 Wash. & Lee L. Rev. 417, 427 n.36 (2005) ("The line separating claims

involving an undertaking of responsibilities by the franchisor sufficient to create a duty for the purposes of direct liability from claims based on franchisor control sufficient to support vicarious liability under an actual agency theory may be indiscernible, if a line exists at all.")).

LSI makes that argument in its reply brief, contending that *Allen*, a vicarious-liability case, sets the standards for direct-negligence theories. *See* Reply [491] at 7. In *Allen*, the Mississippi Court of Appeals held that a franchisor's vicarious liability depends on control.

> Other jurisdictions that have addressed the question of a franchisor's vicarious liability have noted that a franchise relationship is far different from a contract of employment where the rules of master/servant are typically applied. *Kerl v. Dennis Rasmussen, Inc.*, 273 Wis. 2d 106, 682 N.W.2d 328, 337 (2004). Because of this difference, courts have held the franchisor vicariously liable only when it had the right to control the specific instrumentality or aspect of the business that was alleged to have caused the harm.

942 So. 2d at 821–22. The court found this "consistent with Mississippi law." *Id.* at 822.

After explaining the legal inquiry, *Allen* next considered whether the franchisor's brand-protecting standards exerted enough control to trigger liability. The court said "no."

> [T]he majority of courts do not consider the rules and regulations, which are part of the franchise agreement, as a measure of direction and control. Instead, the courts find that these very specific and strict rules are a way for the franchisor to protect its trademark and to protect the public. We find no evidence in the record which would show that Choice had the right to control the day-to-day activities of the Gulfport Comfort Inn. Without such a showing of control or right to control, the franchisor should be granted summary judgment.

*Id.* at 827–28. Though not binding, *Allen* adds weight to LSI's argument that Plaintiffs cannot show a legal duty without proof that LSI either had or exercised control over the pools.

**Out-of-state decisions.** Going beyond Mississippi renders the same result. "[D]irect liability cases look to the franchisor's actual control or retained right of control to determine the presence of a duty for purposes of evaluating whether the franchisor was itself negligent." *Kerl v. Dennis Rasmussen, Inc.*, 682 N.W.2d 328, 334 n.3 (Wis. 2004). For example, restaurant

franchisors who recommend or select specific equipment for their franchisees can be held liable if it proves defective. *Wise v. Ky. Fried Chicken Corp.*, 555 F. Supp. 991, 995–96 (D.N.H. 1983); *Whitten v. Ky. Fried Chicken Corp.*, 570 N.E.2d 1353, 1356–57 (Ind. Ct. App. 1991). But the level of control sufficient for a duty "must consist of something more than a general right to make suggestions or recommendations or to order the work stopped or resumed." *Id.* at 1356 (quoting *Coty v. U.S. Slicing Mach. Co., Inc.*, 373 N.E.2d 1371, 1375 (Ill. Ct. App. 2005)).

The Fourth Circuit reached the same conclusion in *Allen v. Choice Hotels International, Inc.*, a case that coincidentally shares the same name as the Mississippi Court of Appeals case LSI cites. 276 F. App'x 339 (4th Cir. 2008). There, six guests died in a hotel fire. The plaintiffs, similar to Plaintiffs here, "allege[d] that the franchisor, Choice, was directly liable . . . because it failed to require [the franchisee] RGH/Gedda to retrofit the hotel with sprinklers" despite knowing the fire risks. *Id.* at 340.

Among several relevant holdings, the Fourth Circuit rejected a common-law negligence theory like Plaintiffs' theory under Mississippi's *Dr. Pepper* holding. The court first stated that "South Carolina common law recognizes a separate duty to use due care where an act is voluntarily undertaken for the benefit of a third party." *Id.* at 343–44. But "the fact that Choice required RGH/Gedda to install fire safety systems and made recommendations in its Rules and Regulations that RGH/Gedda install sprinklers does not establish that Choice voluntarily undertook to control or regulate the life safety systems." *Id.* at 344 (citing *Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 93–94 (E.D.N.Y. 2000);[1] *Helmchen v. White Hen Pantry, Inc.*, 685 N.E.2d 180, 182 (Ind. Ct. App. 1997)). Rather than volunteering to regulate safety and make repairs, the court concluded that "Choice merely guarded its trademark by assuring uniform

---

[1] The Mississippi *Allen* decision cited *Wu* for the same principle. 942 So. 2d at 826.

12

appearance and operations of hotels operating under the Comfort Inn mark." *Id.* (citing *Helmchen*, 685 N.E.2d at 182 ("These mandatory procedures are intended to assure uniformity of operation and appearance, and to protect . . . trademark and the good will associated with it.")).

At least two federal district courts tracked the Fourth Circuit's *Allen* opinion in cases involving infections from recreational waters. First, in *Triplett v. Soleil Group, Inc.*, the court found no proof of direct franchisor liability when a plaintiff allegedly caught Legionnaires' Disease from a hotel's pool or whirlpool. 664 F. Supp. 2d 645, 650 (D.S.C. 2009). That court concluded, "Without more evidence that Starwood or Sheraton operated the Hotel, or at least exerted control over the day-to-day operation and maintenance of the Hotel's swimming pool and whirlpool tub, the court does not find that these Defendants directly owed a duty to Plaintiffs." *Id*.

The court in *Braucher* said the same thing. 702 F. Supp. 2d at 1043–44. The plaintiffs there asserted direct-negligence claims against the franchisor, Choice Hotels, after being infected in a hotel swimming pool. Like LSI, the franchisee in *Braucher* was an owner/operator. *Id.* at 1043. More to the point, the court noted that things like setting specific franchise standards and even inspecting the pools for cloudiness did not make Choice Hotel a volunteer with duties to the invitees:

> Choice Hotels never voluntarily took on the task of maintaining the water to avoid the risk of infection. Again, Choice Hotels made visual inspections of the pool and spa area twice a year at most, and retained the right to close the pool and spa if the water was cloudy because of the risk of drowning, not because of the risk of toxic bacteria build-up. None of the evidence presented indicates that Choice Hotels assumed that duty.

*Id.* at 1044. The *Braucher* court therefore granted summary judgment for Choice Hotels on the negligence claim. *Id.* LSI relies heavily on *Braucher*; Plaintiffs neither distinguish it nor offer competing authority supporting their direct-liability theories.

13

***The* Erie *guess*.**  The Court believes Mississippi would follow other courts and require proof that the franchisor assumed or retained control over water-management operations at the pools before finding that it had a legal duty over water safety.  Plaintiffs cite no contrary authority, and "[w]hen sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts."  *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018).

So the remaining task is to consider if Plaintiffs have created a material dispute whether LSI voluntarily assumed or retained control over the Park's water-safety program.

***The facts.*** Plaintiffs say LSI knew of *E. coli* dangers, knew Jellystone was ill-equipped to handle those dangers, and knew Mississippi had no regulations that would protect visitors, yet LSI let Jellystone operate unassisted and never sought to ensure that the water was safe.  While the parties dispute those points, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The material dispute is whether LSI had control over the pools' water management.  On that point, Plaintiffs' theory hurts their cause.  Rather than showing that LSI operated the pools, Plaintiffs accuse LSI of refusing to do so:

- The Franchise Agreement made the owner/operator an independent contractor.  Pls.' Mem. [472] at 6–9.

- LSI's Branding Standards Manual is "over 800 pages long and sets forth comprehensive standards for almost every conceivable aspect of a franchisee's business operations" except water safety.  *Id.* at 7.

- "LSI's annual audit of this facility was specifically engineered to avoid the subject of water safety altogether—in fact, LSI trained its assessors to avoid the subject altogether."  *Id.* at 11.

- "LSI leaves it to the discretion of its franchisees whether to even have a Certified Pool Operator on staff." *Id.*

- "LSI has no mechanism in its business by which it can ascertain whether a franchisee even has policies and procedures relating to water safety." *Id.* at 12.

The Court assumes those facts—and others like them—are true. But they all support LSI's argument that it had no control over the day-to-day operations of the pools. While one could debate whether the law is fair, Plaintiffs offer no evidence that LSI exercised control over water management to the degree necessary to trigger legal duties to the invitees. Indeed, LSI's involvement in water-safety operations was even less direct than the *Allen* franchisor's involvement in fire protection. 276 F. App'x at 344 (noting no duty to ensure sprinklers were installed because franchisor recommended but did not require sprinklers); *see also Braucher*, 702 F. Supp. 2d at 1043–44 (finding no volunteered duties over water management despite pool inspections).

Plaintiffs do offer one fact that could show more involvement. They say that LSI heard complaints about general cleanliness and cloudy water a few weeks before the outbreak and that LSI exercises oversight to make sure complaints are addressed. *See* Pls.' Mem. [472] at 8, 14. But even here, Plaintiffs fault LSI for not acting on an operational level, arguing that it "failed to take action or ensure [the Park] addressed these serious concerns." *Id*. at 14.

The evidence backs that up. When receiving a complaint, LSI would notify the franchisee and instruct it to let LSI know when it had resolved the issue. Schutter Dep. [471-1] at 188. LSI relied on the franchisee to handle the problems and would follow up if it didn't report back. *Id.* There is no cited evidence that LSI somehow stepped in and corrected the

15

water-treatment issues after receiving complaints. In fact, it admits that it did nothing "to ensure that water treatment of any sort was being conducted." *Id.* at 185.

Pretty much the same thing happened in *Allen*, when the Fourth Circuit held that "accepting and forwarding hotel-guest complaints to the franchisee does not indicate that Choice voluntarily undertook to regulate safety systems." 276 F. App'x at 344. *See also Braucher*, 702 F. Supp. 2d at 1043–44 (checking pools for cloudy water failed to establish that franchisor operated pools). Plaintiffs never claim that LSI stepped in, handled the complaint, and took control over the pools. They just say LSI should have.[2]

It comes down to this: the record shows LSI is in the branding business, not the water-management business. When the present owners bought the park from the prior franchisee, their relationship with LSI mainly concerned whether they could use the Yogi Bear brand. The franchise agreement did not prescribe details of hygienic water management or give LSI close control over it. And Plaintiffs offer no evidence that LSI exercised control over those functions.

Plaintiffs' facts fail to create a material dispute on direct negligence, let alone gross negligence, against LSI. Under Rule 56, summary judgment is therefore proper.

IV.    Conclusion

The Court has considered all arguments presented. Any not specifically addressed here would not affect the outcome. The Court grants LSI's *Daubert* motion [440] and motion for summary judgment [445] as to all claims against it, which are dismissed with prejudice.

**SO ORDERED AND ADJUDGED** this the 16th day of December, 2024.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

---

[2] There is a causation issue too; Plaintiffs' expert Kloberdanz says "water clarity . . . is of slight consequence," Kloberdanz Rpt. [471-3] at 11, and there is evidence the water was clear when the infections occurred, Jordan Dep. [434-16] at 22.

16